IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WHITNEY NAKITA FELDER | : | CIVIL ACTION |
| v. | : | |
| ANDREW SAUL, | : | |
| Commissioner of Social Security | : | NO. 19-151 |

O P I N I O N

JACOB P. HART  DATE: 1/9/2020
UNITED STATES MAGISTRATE JUDGE

    Whitney Nakita Felder brought this action under 42 USC §405(g) to obtain review of the decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI"). Felder has filed a Request for Review to which the Commissioner has responded. For the reasons that follow, I conclude that Felder's Request for Review should be granted and the matter remanded solely for a calculation of benefits.

I.    Factual and Procedural Background

    Felder was born on June 30, 1986. Record at 151. She graduated from high school and completed several years of college but did not obtain a degree. Record at 196. She has worked in retail clothing sales as a clerk and as an assistant manager. Id.

    On December 11, 2011, Felder filed an application for SSI. Record at 151. This followed an incident the summer of that year where she was arrested in Florida for refusing to pay a cab fare and physically resisting police officers, and sent to a mental hospital for treatment because of psychotic behavior while in custody. Record at 254, 298. Felder alleged disability since July 1, 2011, as a result of mental illness and headaches. Record at 151, 195. Felder's application for benefits was denied initially and upon reconsideration. Record at 97, 100.

Following two *de novo* hearings in 2014 before an Administrative Law Judge, ("ALJ"), benefits were again denied. Record at 11. The Appeals Council denied review on January 27, 2016. Record at 1.

Felder then filed an action in this Court, which was given Civil Action number 16-1231 and assigned to the Honorable Joseph F. Leeson, Jr. On April 19, 2017, Judge Leeson adopted a Report and Recommendation written by the undersigned, and remanded this matter to the Commissioner for "further development of the record, including consideration of Felder's therapy notes, procuring a functional assessment from her treating professionals, and the taking of testimony from a medical expert if needed." Order docketed in this case as Document No. 2. The Appeals Council issued a remand order on October 24, 2017. Record at 463.

An additional hearing in this case, before a different ALJ, took place on March 27, 2018. Record at 362. On November 6, 2018, however, the ALJ issued a written decision denying benefits. Record at 341. The Appeals Council did not issue a new ruling. Felder then filed the present action. The parties consented to proceed before the undersigned.

II.     Legal Standards

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Richard v. Perales, 402 U.S. 389 (1971); Doak v. Heckler, 790 F.2d 26, 86 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, supra, at 401; Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). The court must also ensure that the Agency used the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a twelve-month period." 42 U.S.C. § 423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider our work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirements in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are disabled.

20 CFR § 404.1520 (references to other regulations omitted).

III.  The ALJ's Decision and Felder's Request for Review

In the decision now under review, i.e., the November 6, 2018, decision, the ALJ found that Felder suffered from the severe impairments of schizophrenia, schizoaffective disorder, and post-traumatic stress disorder. Record at 343. She found, however, that no impairment, and no combination of impairments, met or medically equaled a listed impairment. Record at 344.

The ALJ determined that Felder retained the residual functional capacity ("RFC") to engage in a full range of work at any exertional level, but with the following non-exertional limitations: "the claimant is limited to work with simple, routine, and repetitive tasks as defined in the Dictionary of Occupational Titles (DOT) as specific vocational preparation (SVP) levels 1 and 2; the claimant is limited to occasional interaction with the general public, co-workers, and

3

supervisors; the claimant requires jobs where the complexity of tasks is learned by demonstration and performed by repetition with few variables, where little judgment is required; and any changes in the workplace need to be infrequent and gradually introduced." Record at 345.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ concluded that Felder could work as a cleaner, a bagger in the garment industry, or a drier attendant in the garment industry. Record at 354. Accordingly, she decided that Felder was not disabled. Record at 355.

In her Request for Review, Felder argues that the ALJ erroneously rejected the opinions of her treating and examining physicians; improperly evaluated the credibility of testimony provided by her father; and failed to include all of her established limitations in the hypothetical questions posed to the vocational expert. She also argues that she should have been found to meet the requirements of Listing 12.03.

IV. Discussion

A. The Medical Opinions

One of the factors which led to the 2016 remand of this case was the lack of a functional assessment by a treating professional in the record. (At that stage, Felder was proceeding without representation, and the lack of development in the record was legally attributable to the ALJ). The record still lacks an assessment by a treating professional, but the Agency procured a new consultative examination by Elisabeth N. Gibbings, Psy.D., who also completed a functional assessment. Record at 880. On April 13, 2018, Gibbings opined that Felder was markedly limited in the ability to interact appropriately with the public, supervisors, or co-workers, or to respond appropriately to usual work situations and to changes in a routine work setting because of "diminished emotional expression, avolition [and] alogia." Record at 881-2.

4

The ALJ accepted Dr. Gibbings' evaluation in part, but rejected her findings of marked limitations as "inconsistent with the record as a whole." Record at 352. The ALJ relied upon her observation that Felder was frequently said to be "cooperative" by mental health service providers. Id. Even Dr. Gibbings described Felder as "generally cooperative." Record at 877.

However, despite being cooperative, Felder displayed serious abnormalities. According to Dr. Gibbings, Felder's responses were "noticeably lacking true content" and her "social skills were poor." Record at 877. Felder denied experiencing auditory or visual hallucinations, but she also told Dr. Gibbings that "the TV does sometimes talk directly to her" and that she believed "people are out to get her." Record at 876. Her hygiene and grooming were poor, and she appeared somewhat unkempt. Record at 877. At this time, Felder reported taking aripiprazole (marketed as Abilify). Record at 876.

Similarly, on November 28, 2016, Felder was noted by her psychotherapist to be "cooperative." Record at 842. Nevertheless, she was also "unable to follow through with response, loose association, tangential thoughts." Again, she was medicated with Abilify at the time of the session. Id.

Indeed, the avolition and alogia described by Dr. Gibbings are noted throughout the record.[1] A Biopsychosocial Evaluation completed on August 2, 2016, at Crozer Keystone Health System Community Division stated:

> Miss Felder presented with an indifferent mood and appropriate behavior during the interview. Her speech was at a normal rate and low volume. She exhibited a flat affect. Her thought processes were not goal directed with apparent cognitive deficits in communication, processing and memory. Her perception and process appeared outside normal limits. Miss Felder could neither deny or confirm suicidal ideation in the past or

---

[1] "Avolition" (a behavioral reduction of self-initiated and purposeful acts) and "alogia" (decrease in verbal output or expressiveness) are two typical negative symptoms of schizophrenia, as is diminished emotional expression ("blunted affect"). Http:/ncbi.nim.nih.gov/pmc/articles/PMC5479085/. (Last visited January 2, 2020).

5

currently.  She engaged in conversation, and maintained good eye contact.  She was not well groomed and did not appear to be a reliable historian.

Record at 837.  The Crozer Keystone clinician also wrote of Felder: "She is not social and often uses word salads."[2]  Record at 838.

Even earlier, shortly after Felder's 2011 arrest, the Orange County Corrections Department health services said of her: "She attempts to be cooperative but answers do not match questions."  Record at 712.  She was referred to Lakeside Behavioral Healthcare, where she was treated for six weeks, after the prison mental health personnel noted that she was "mentally confused, withdrawn, and responding to internal stimuli."  Record at 254, 298.  Clearly, a cooperative attitude is not equivalent to a normal mental state.

Further, when non-compliant with medication, Felder was not always cooperative.  An October 6, 2016, note from Crozer Keystone reflects that Felder was rejected from a partial hospitalization program to which she had been recommended by her first therapist on the basis that she needed inpatient treatment:

> American Day (Mirmont Outpatient) program called and stated that they met with Whitney for 2 hours and weren't able to obtain much information from her.  The intake assessor stated that Whitney did not want to be there and that she appeared very paranoid.  She would not meet with the assessor without her father.  The intake worker stated that they recommend inpatient treatment but did not think it was appropriate to 302 her [i.e., involuntarily commit her] due to denying SI/HI and she did not seem like a danger to herself or others.  The intake worker suggested that we keep the recommendation of inpatient care.

Record at 853, and see 854 ("Whitney did not respond appropriately to questions and seemed disorganized").

---

[2] According to the American Psychological Association, "word salad" refers to severely disorganized and virtually incomprehensible speech, marked by severe loosening of associations, which is "strongly suggestive of schizophrenia."  Http://dictionary.apa.org/word-salad.

It has been recognized that noncompliance with medicine on the part of a mentally ill claimant may be a result of the mental impairment. See Franklin v. Barnhart, Civ. A. No. 05-2215, 2006 WL 1686692 at *10 (E.D. Pa. June 13, 2006); Portnoff v. Apfel, Civ. A. No. 96-6914, 1998 WL 23171 at *4 (E.D. Pa. Jan. 22, 1998); Mendez v. Chater, 943 F. Supp. 503, 508 (E.D. Pa. 1996). The record here suggests that this is the case with Felder.

In May, 2012, Felder began treating at the McIntosh Trail Community Care Center in McDonough, Georgia, where she was noted to suffer from a psychotic disorder and to display poverty of speech, disorganized responses, and catatonic behaviors. Record at 766. A February 28, 2013, treatment note observed: "She has a history of refusing meds." Record at 779. Because of this, clinicians there decided to administer medication by injection. Record at 780. Several months later, in May, 2013, Felder became resistant to the injections, stating: "I'm not taking that shot because I don't take drugs." Record at 795. Felder also initially refused medication during her 2011 mental hospitalization in Florida at Lakeside Behavioral Healthcare. Record at 251.

After citing the notations of Felder's cooperativeness, the ALJ rejected Dr. Gibbings's findings of marked impairments on this basis:

> I also note that while participating in the program at Horizon House in 2017, claimant was able to attend clubhouse, hand out notes to other residents and assist at the front desk. These activities involve the ability to social interact [*sic*] with colleagues, staff, residents and guests and are contrary to a finding that the claimant has marked limitations in this domain.

Record at 353.

Horizon House clubhouse, however, was a social day program for mentally ill individuals. Record at 650-691. It may not be accurate to describe it as partial hospitalization, since records do not show that therapy sessions were held there. However, progress notes show that it was a therapeutic program which developed skills on a very basic level. The progress notes indicate that Felder was working on the domain of "socializing." Id. Apparently, this involved encouraging simple verbal exchanges on topics such as Felder's weekend plans, or her grandmother's health. Record at 676, 678, 680, 684. In a section of each progress note labeled "Plan", there were notes such as "This worker will continue to encourage Whitney to engage with her peers" or "This worker will encourage Whitney to be social with her peers and participate in activities." Record at 657, 659, 663, 667, 675, 685, 687, 688, 691.

On many progress notes, Felder's goal was: "Answer the phone in member services," although there was no note which stated that she ever actually answered phones. Record at 650-691. Some days she explicitly refused to do it. Record at 671, 683. Other tasks which Felder performed were quite elementary, such as shredding paper and handing out progress notes to the other clients. Record at 672, 683.

Thus, Felder's attendance at the Horizon House clubhouse did not demonstrate that she had less than marked limitations in interacting with others. On the contrary, it shows that she required therapeutic assistance in this area. While the "socializing" at Horizon House represents progress from the "catatonic" behavior noted in earlier records, it is by no means clear that the progress notes undermined Dr. Gibbings' finding of marked limitations.

The ALJ also rejected reports authored by Jeffrey Danziger, MD, and Alan Berns, MD, psychiatrists who evaluated Felder in 2012 in preparation for the disposition of the criminal charges against her. The ALJ said that their findings of acute psychosis and paranoia were "contrary to the claimant's presentation when initially arrested." Record at 351.

This was a remarkably short-sighted analysis of the record. Felder may have appeared normal on the day of her arrest, but two days later prison health services generated the note which I have partially quoted above:

> Pt presents with poor eye contact, speech is minimal with loose associations. She attempts to be cooperative but answers do not match questions. Pt confabulates and that may be on her level of paranoia. She appears to be responding to internal stimuli and as much as admitted to that in the interview.

Record at 712. "Confabulation" refers to the fabrication of imaginary experiences as compensation for the loss of memory. [Http://healthline.com/health/confabulation](Http://healthline.com/health/confabulation). (Last visited January 7, 2020).

On August 16, 2011, the prison health services noted: "Pt presents with little to no responses to questions, eye contact is fleeting at best, and she is actively and obviously responding to auditory hallucinations both mentally and physically." Record at 708. A week later: "No change, pt continues to exhibit very paranoid behaviors … she appears to be constantly attending to auditory hallucinations." Record at 704. Similarly, on September 2, 2011: "No change, pt continues to respond minimally, to display high levels of paranoia and is obviously responding to internal stimuli." Record at 701. At that point, Felder was sent to the mental hospital where – as discussed above – she was treated for six weeks. Record at 700.

In summary, I agree with Felder that the ALJ wrongly assessed the opinions of Drs. Gibbings, Danziger and Berns. The reasons she gave for rejecting their findings were not supported by substantial evidence.

9

B.     Stephen Felder's Evidence

At one of the 2014 hearings before the first ALJ, testimony was taken from Felder's father, Mr. Stephen Felder. Record at 63. Mr. Felder stated that his daughter was incapable of working because she was "incapable of handling any thought process or completing any thoughts." He said: "If you notice that you was asking her questions and she's all over the map. She's incapable of completing her thoughts. She spends a lot of time staring off in the wild blue yonder." Id.

In the 2018 decision now under review, the ALJ wrote that she accorded Mr. Felder's testimony "little weight." Record at 353. She explained: "Although Mr. Felder had the opportunity to spend considerable time with the claimant, he is not an acceptable medical source. Moreover, his opinion is inconsistent with the record as a whole, which demonstrates that while the clamant retains some mental symptoms and signs, these generally improved with medication and treatment." Id.

First, it should be quite obvious from the agency regulations that third-party testimony cannot be rejected on the basis that it is given by a third party. As a judge in the Middle District of Pennsylvania pointed out:

> The Commissioner encourages claimants to submit third party statements, and recognizes the relevance of statements from individuals who know the claimant. See 20 CFR §§416.912, 416.913 and 416.929; SSR 96-7p and 96-8p. Third party statements can support a claimant's credibility, and help evaluate the claimant's impairments, symptoms, limitations, functioning, and activities of daily living. Id; see also Burnett [v. Commissioner of Social Security], 220 F.3d [112] at 122 [3d Cir. 2000].

Maellaro v. Colvin, Civ. A. No. 3:12-01560, 2014 WL 27707717 at *12 (M.D. Pa. June 18, 2014). A third-party witness would not be permitted to give a medical diagnosis, but Mr. Felder did not need a medical degree to know that he saw his daughter staring into space, and giving incoherent answers to questions.

Even more importantly, Mr. Felder's testimony was not inconsistent with the rest of the record. Instead, it was strongly corroborated. As set forth above, there was ample evidence from mental health professionals that Felder was incoherent in conversation, and sometimes catatonic. Record at 712 (Orange County Corrections Department health services note); 766 (treatment note from McIntosh Trail Community Care Center); 853 (Crozer Keystone note of October 6, 2016); 838 (Crozer Keystone evaluation of August, 2016); 842 (November 28, 2018, therapy note); 876-7 (Dr. Gibbings). Also see Record at 748 (Lakeside Behavioral Healthcare note: "client unresponsive"). Some of these observations were made at times when Felder was medicated. Record at 842, 876-7.

In fact, Mr. Felder's description of his daughter was also corroborated by her testimony at the most recent, March 27, 2018, hearing. At this time, Felder was taking Abilify. Record at 406.

Repeatedly, Felder was unable to give straight answers to questions on simple matters such as her address, and her duties in jobs she had held. The ALJ often ended up turning to counsel for answers. Immediately after Felder was sworn in, this interchange took place between her and the ALJ:

ALJ: What's your current address, Ms. Felder?

FELDER: I've got some medication right here, so I can hand it to you.

ALJ: No, where do you live?

FELDER: In Pennsylvania.

ALJ: What's the address, the street you live on?

FELDER: Elson Road.

…

ALJ: And where is that?

FELDER: In Delaware.

ALJ: It's in Delaware?

FELDER: Uh-huh.

ALJ: Okay. Because that's not Pennsylvania. … Do you have a photo ID with that current address on it?

FELDER: Uh-huh. It says in Pennsylvania.

ALJ: Well, Delaware is, is not Pennsylvania. … [Apparently to counsel] Where do you believe she lives?

Record 378-380. The ALJ eventually determined on her own that Elson Road was in Chester, in Delaware County, Pennsylvania. Record at 383.

The description Felder was able to give of her prior employment was incoherent enough that the ALJ told counsel that she would rely on the work history report completed in 2012, saying: "It provides a lot more clarity than I'm hearing today." Record at 396.

Later in the hearing, this exchange occurred:

COUNSEL: Whitney, why are you in treatment? Why do you need treatment?

FELDER: Once I got arrested – right before I got arrested, the lady took it into her hands. And I was physically abused and I had trauma, and they were going to go ahead with that, with the too many cops that they had on the scene, and I made sure that that was going to be known in court as soon as I could get there.

COUNSEL: Has what happened to you affected your ability to think? … has it at times made you lose control of things?

FELDER: Some things I hadn't had control over, I had to just make sure that I was in line. What would you ---

ALJ: I don't know that she understood that question.

COUNSEL: Well, I'm just trying to get her to tell us … from a mental or emotional point of view, what kind of shape have you been in since this happened?

> FELDER: Well, it took all, it took all of that to get back, and treatment and help from others. I can't – I wouldn't just leave out the part, like, from getting dressed, from getting dressed – I had to get clothes, like, from the jail, and since then I've just been accepting clothes from relatives and handouts and hand-downs from relatives that were able to be able to [*sic*] – weren't wearing the same clothes anymore. And meals had to be prepared by those as well. And it was, like, two years before I could get, like, hair or anything done, even that little manicure or – at the house – the center that I went to. That was going on, like, a third year. I had to just wear what I had and keep going and I had to just maintain what I had going with –

Record at 424. At that point, the ALJ interrupted with: "So, she's saying that her financial situation is different." Id.[3]

Shortly after that, in a discussion of daily chores she could perform, Felder said: "She's – the lady that worked there or on a place she, like, had I seen ma any time soon because I was with his ma and he – and I told her that I hadn't seen her, it was going on two and a half years and she --." Record at 429. The ALJ cut Felder off again: "Okay. You're getting off the, the questions. I need you – I want you to stay focused." Id. Counsel said: "Your honor, that's, that's part of the illness." Id. The ALJ responded: "I understand that." Id.

Also, although this was Felder's third Social Security hearing, she persisted in describing her 2011 arrest so extensively that the ALJ had to explain to her: "[T]he situation in Orange County, while possibly troubling, is something that is beyond our control. It's not a Social Security related issue … so we're not going to focus on that here today." Record at 404. Counsel added: "I have explained what you just said to the claimant – to my client as well, your honor." Id.

---

[3] It is not clear that the ALJ correctly interpreted Felder's testimony about clothing and grooming as referring to financial difficulty. As noted, a number of the treatment records described Felder as unkempt, and the Horizon House clubhouse notes indicate that she was encouraged to attend to her appearance: "Whitney … was praised for her return and also her new hair-do." Record at 658; "She participated in Lipstick Day Celebration by getting a makeover. … This worker participated in the lipstick celebration with Whitney and other members trying to get her to get a make over and engage with her peers." Record at 664.

13

After this hearing, it is surprising that the ALJ would conclude that Stephen Felder's description of his daughter as "all over the map" and "unable to complete her thoughts" was inconsistent with the record. I therefore agree that ALJ erred in rejecting Mr. Felder's testimony.

C.  The Hypothetical Questions to the Vocational Expert

The ALJ did recognize that Felder was limited in her ability to interact with others. Record at 344. As noted, her RFC assessment specified that Felder could only have occasional interaction with the general public, co-workers and supervisors. Record at 345. These limitations were included in the hypothetical questions which the ALJ posed to the vocational expert in order to determine whether there was work Felder could perform. Record at 435.

Given the evidence discussed above, however, it is clear that Felder's ability to interact was more limited than described by the ALJ. Medical evidence, Felder's testimony, and the testimony of her father, all indicate that – although Felder was willing to engage in conversation (as least when medicated) – she was not competent in absorbing and conveying information. As Felder's counsel elicited from the vocational expert, a claimant who is not able to have any interaction with supervisors is not able to work. Record at 439.

D.  Listing 12.03

Listing 12.03 pertains to schizophrenia spectrum and other psychotic disorders. 20 CFR Part 404, Subpart P, App. 1 at §12.03. Felder argues that she meets the requirements of 12.03C, which requires "serious and persistent" disease; ongoing medical treatment or a highly structured setting; and marginal adjustment, meaning that the claimant has a minimum capacity to adapt to changes in her environment or to new demands. Id. at §12.03C.

As set forth below, I will grant Felder's motion. Accordingly, it is not of great importance whether or not Felder meets Listing 12.03. I note, however, that there is no medical evidence addressing Felder's ability to adjust to changes or new demands.

E.   Remand v. Reversal

Following review of an ALJ's decision, a district court may affirm, modify, or reverse the Commissioner's decision. 42 USC §405(g). A reversal for the award of benefits may be appropriate where substantial evidence on the record indicates that the claimant is disabled and entitled to benefits. Newell v. Commissioner of Social Security, 347 F.3d 541, 549 (3d Cir. 2003).

Upon remand, the ALJ was directed to obtain testimony from a medical expert, if necessary. Although the ALJ did not deem it necessary, it might be considered appropriate to remand this matter to permit her to obtain such testimony, in light of the comments in this Opinion. Nevertheless, substantial evidence on the record does indicate that Felder's ability to interact with others is too limited to permit her to work. Moreover, there have already been three hearings, and two ALJ decisions in this case. Offering the Agency a third opportunity to craft a decision which is supported by the medical record seems excessive.

Further, reversal rather than remand can be appropriate where remand will result in considerable delay which is not attributable to the claimant. Morales v. Apfel, 225 F.3d 310, 320 (3d Cir. 2000), citing Podedworny v. Harris, 745 F.2d 210, 223 (3d Cir. 1984). This case was filed in 2011. The first remand resulted in a decision issued four years after the initial decision, implying that Felder might not get a third decision until 2022. Having taken these factors into consideration, I will not order another remand. Rather, I will return the matter to the Agency solely for a calculation of benefits.

V. <u>Conclusion</u>

In accordance with the above discussion, I conclude that Felder's Request for Review should be granted, the decision of the Commissioner reversed, and the matter remanded to the Agency solely for the calculation of benefits.

BY THE COURT:

/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE